**Nettie PEELE, Appellee,**

v.

**ATLANTIC EXPRESS TRANSPORTATION GROUP, INC., Atlantic Paratrans of Pennsylvania, Kemper Insurance Company and Lumberman's Mutual Casualty Company, Appellants.**

Superior Court of Pennsylvania.
Argued Oct. 8, 2003.

Filed Dec. 31, 2003.

---

Walter J. Timby, Philadelphia, for appellants.

Patricia D. Buckley, Philadelphia, for appellee.

Before: STEVENS, OLSZEWSKI and BECK, JJ.

OPINION BY BECK, J.:

¶ 1 This is a dispute regarding insurance coverage. The plaintiffs-appellees, Nettie Peele and Tyrone Sylvester, were injured in two separate motor vehicle accidents while each was employed as a transit driver for Atlantic Paratrans of Pennsylvania (Atlantic). Sylvester's accident with an uninsured driver took place on February 22, 1999. Peele's accident with an underinsured driver took place on March 22, 1999. Sylvester and Peele made claims for uninsured motorist (UM)

and underinsured motorist (UIM) benefits, respectively, against defendant-appellant Lumberman's Mutual Casualty Company, a division of Kemper Insurance Company, which insured Atlantic.[1]

¶ 2 Kemper tendered $35,000 each to Sylvester and Peele, taking the position that this amount was the limit of coverage for UM/UIM benefits under the policy issued to Atlantic. Sylvester and Peele then filed this declaratory judgment action, seeking a declaration from the court that the actual applicable UM/UIM coverage limits were $2,000,000 for each claimant. After a non-jury trial, the Honorable Arnold L. New determined that the higher limits applied. Post trial motions were denied, and this timely appeal followed.

 ¶ 3 We consider whether the trial court correctly held that the terms of the insurance binder in effect at the time of the appellees' accidents provided UM/UIM coverage in the amount of $2,000,000. The trial court found:

> Atlantic employed AON Risk Services of Missouri [AON], an insurance broker, to obtain the commercial insurance. On or about December 22, 1998, AON presented an Insurance Proposal to Atlantic, which summarized the various coverages that would be provided in all states in which Atlantic conducted business. For "Business Automobile," the limits were listed as **$2,000,000 in liability** coverage and **"statutory" UM/UIM** coverage. Under "Coverage Modifications... By specific endorsement to the policy," there were 16 types of endorsements listed; however none of them applied to a reduction or rejection of UM/UIM coverage. Based on the coverages outlined in the Proposal, Atlantic authorized AON to bind this insurance. On or

about December 29, 1998, AON delivered three binders to Atlantic at its offices in New York, reflecting placement of Atlantic's general liability, worker's compensation and commercial automobile insurance for every state in which Atlantic conducted operations. Binder No. 11544 applied to Atlantic's business coverage and indicated that temporary commercial automobile insurance had been obtained from Lumberman's Mutual Casualty in accordance with the Insurance Proposal. The binder indicated a liability limit of $2,000,000 and referenced an Addendum for additional coverages under the binder. The Addendum listed the limits of UM/UIM coverage as "statutory" for every jurisdiction in which Atlantic operated, including Pennsylvania. Like the proposal, the Addendum contained a section delineating 16 coverage modifications by specific endorsement to the policy. None of the 16 endorsements related to a rejection of UM/UIM coverage or to a reduction of the limits of this coverage...

¶ 4 After the binder became effective in December 1998, the Sylvester and Peele accidents occurred—in February and March of 1999. On April 21, 1999, the Chief Financial Officer of Atlantic returned a signed copy of the "Final and Accepted Insurance Proposal" to Kemper. At this time, under the Policy Specifications, Limits of Liability, Uninsured Motorists, the limits of coverage for all states in which Atlantic operated was listed, for the first time, as **"Minimum Statutory** without rejecting (no stacking of limits)."

¶ 5 Finally, on June 24, 1999, AON forwarded to Atlantic various forms in con-

---

**1.** We refer to the defendant-appellant insurer as "Kemper" herein. We further note that the parties also refer to the insured as "Atlan-

tic Express Transportation Group." However, no one disputes that the Kemper policy covers the relevant insured entity.

nection with the Kemper insurance policy. Among these forms were requests to reject or reduce UM/UIM coverage in all states where such reduction or rejection was possible, including Pennsylvania. Atlantic returned these forms to AON on or after July 20, 1999. For the first time, Atlantic indicated in writing a selection of a specific limit of $35,000 applicable to Pennsylvania UM/UIM coverage. A written request for lower UM/UIM coverage limits is authorized in Pennsylvania by 75 Pa.C.S. § 1734.[2]

¶ 6 Appellant argues that, under these circumstances, the trial court erred in "reforming" the Atlantic policy to provide more than the requested $35,000 UM/UIM coverage limit. They essentially argue that the binder's terms were retroactively changed by the request for lower limits submitted in April and June 1999. Furthermore, they claim that even if the binder's terms control for the period during which appellees' accidents took place, the binder's provision of "statutory" UM/UIM coverage actually refers to the "statutory *minimum*" UM/UIM coverage required by each state. Appellees counter by asserting that the original binder's terms provide "statutory" coverage, and that the lower limits of coverage did not take effect until after their accidents, when the final UM/UIM policy revisions were signed and returned to Kemper. Until then, the binder's terms controlled coverage. We agree.

■■■ ¶ 7 We first note that under well-settled Pennsylvania insurance contract law, the law of the state where the policy was delivered is the law applied in construing its terms. *Crawford v. Manhattan Life Ins. Co.*, 208 Pa.Super. 150, 221 A.2d 877 (1966). There is no dispute that the policy in this case was delivered in New

York, and that therefore New York law applies to interpretation of the contract. However, Pennsylvania law does not differ from New York law on the relevant issues, and we cite to cases from both jurisdictions in our discussion, as did the parties in their briefs.

■■ ¶ 8 A preliminary contract of insurance, evidenced by a written memorandum or binder, is valid and effective, even though a loss occurs before a formal policy is issued. *Rossi v. Firemen's Ins. Co.*, 310 Pa. 242, 251, 165 A. 16 (1932). *See also Springer v. Allstate Life Ins. Co.*, 94 N.Y.2d 645, 710 N.Y.S.2d 298, 731 N.E.2d 1106 (2000) (a binder provides interim insurance, usually effective as of the date of application, which terminates when a policy is either issued or refused). A binder has been defined as a " 'written instrument, used when a policy cannot be immediately issued, to evidence that the insurance coverage attaches at a specified time, and continues, . . . until the policy is issued or the risk is declined and notice thereof given.' " *Harris v. Sachse*, 160 Pa.Super. 607, 52 A.2d 375, 378 (1947). *See also Springer, supra* (an insurance binder is a temporary or interim policy effective only until a formal policy is issued).

¶ 9 The December 1998 binder in this case provided for "statutory" UM/UIM coverage. The trial court held that this term was unambiguous, and referred to the statutory language of 75 Pa.C.S. § 1731, which requires that insurers offer UM/UIM coverage to their insureds, and if such coverage is rejected by the insureds, the rejection must be in writing in accordance with the forms set forth in the statute. 75 Pa.C.S. § 1731(a), (b), (c). Furthermore, the statute provides that if a

---

**2.** Section 1734 provides that a "named insured may request in writing the issuance of coverage [for UM/UIM protection] in amounts equal to or less than the limits of liability for bodily injury." 75 Pa.C.S. § 1734.

proper rejection is not obtained by the insurer, "uninsured or underinsured coverage, or both, as the case may be, under that policy shall be equal to the bodily injury liability limits." 75 Pa.C.S. § 1731(c.1). In this case, the bodily injury liability limits were $2,000,000. The trial court thus held that, in the absence of a properly executed UM/UIM rejection, the initial binder provided "statutory" UM/UIM coverage limits of $2,000,000.

██ ¶ 10 In making its argument that Atlantic intended for *minimum* statutory coverage to apply from the time Kemper first issued a binder, regardless of the actual terms of that binder which refer to "statutory" limits, Atlantic points out that a binder may include an oral contract of interim insurance and may rest upon a parol contract without delivery of a policy to the insured. *See Harris, supra* (workers' compensation insurance binder issued over telephone one day before fatal work accident applied to provide coverage for accident); *Levan v. Pottstown, Phoenixville Railway Co.,* 279 Pa. 381, 124 A. 89 (1924) (insurance may be effective without delivery of a policy to the insured and may rest on an oral contract as long as the parties have reached an agreement as to the insurance). However, this is not relevant here, where there was a writing—the December 1998 binder—that set forth the parties' agreement regarding insurance coverage. Any evidence regarding an oral contract for "minimum" UM/UIM coverage is not relevant under these circumstances.[3]

██ ¶ 11 Furthermore, we note that appellant's argument regarding "minimum" statutory limits fails for an additional reason: there are no "minimum" limits of UM/UIM coverage in Pennsylvania. Although UM/UIM coverage must be *offered* to insureds, "[p]urchase of uninsured motorist and underinsured motorist coverages is optional," as long as it is properly rejected. 75 Pa.C.S. § 1731(a).

[7] ¶ 12 Nonetheless, appellant argues that the terms of the binder regarding "statutory" coverage are ambiguous, and that parol evidence of the parties' understanding and intentions should therefore have been considered by the trial court. However, we note that even if the terms of the binder were ambiguous, both New York and Pennsylvania law require that it be construed in favor of the insured and against appellant. "It is of course true that an insurance policy is to be construed most strongly against the insurer and liberally in favor of the insured so as to effect the dominant purpose of indemnity or payment to the insured, but this is where the terms of the policy are ambiguous or uncertain and the intention of the parties is therefore unclear." *Penn–Air, Inc. v. Indemnity Ins. Co.,* 439 Pa. 511, 517, 269 A.2d 19 (1970). *See also Kula v. State Farm Fire & Cas. Co.,* 212 A.D.2d 16, 628 N.Y.S.2d 988 (1995) (where terms of an insurance policy are ambiguous, they must

---

3. In addition, appellant relies on *Lester v. Century Indemnity Co.,* 356 Pa. 15, 50 A.2d 678 (1947), for the proposition that "[a] binder is not a complete contract, but only evidence of the existence of a contractual obligation to be expressed in complete written form in the future." However, the court in *Lester* focused on flawed jury instructions regarding the parol evidence rule. The issue was whether letters between the insured and insurer constituted an enforceable binder for coverage under a "mercantile open stock theft endorsement" added to a burglary policy, even though it appeared the parties had not yet reduced their agreement regarding the additional coverage to writing. *Lester* is inapplicable to this case, where the binder's terms were in writing, and thus clear, until they were later changed by the UM/UIM reductions made effective after the appellees' accidents.

be construed in favor of the insured); *Frisch v. State Farm Fire & Cas. Co.*, 218 Pa.Super. 211, 275 A.2d 849 (1971) (where, by reason of ambiguity in the language employed in a policy or contract of insurance, there is doubt or uncertainty as to its meaning and it is fairly susceptible of two interpretations, one favorable to the insured and the other favorable to the insurer, the former will be adopted).

¶ 13 We therefore reject appellant's claim that the trial court "reformed" the policy in this case. On the contrary, the trial court applied the unambiguous terms of the insurance binder, which was in effect at the time of the appellees' accidents, to provide coverage in the amount of the bodily injury liability limits. Until June 1999, when Atlantic expressly requested lower limits, there had been neither rejection of UM/UIM coverage pursuant to 75 Pa.C.S. § 1731 nor a written request for lower limits under 75 Pa.C.S. § 1734, and the terms of the December 1998 binder regarding "statutory" limits controlled the amount of UM/UIM coverage available to appellees. We reject appellant's argument that the June 1999 request for lower limits retroactively changed the terms of the binder issued in December 1998; none of the cases cited by appellant authorizes such retroactive application. Appellant cannot rely on a retroactive application of a request for lower limits when it should have obtained such request or rejection of UM/UIM coverage from its insured at the inception of the policy, at the time of the issuance of the December 1998 binder.

¶ 14 Order affirmed.